**COMMONWEALTH ALUMINUM CORP., Kaiser Aluminum & Chemical Corp., and Martin Marietta Corp., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 80–88C.

United States Claims Court.

Jan. 25, 1990.

Paul M. Murphy, with whom were Michael B. Early and Gary F. Firestone, Portland, Or., for plaintiffs.

Terrence S. Hartman, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant. Harvard P. Spigal, Randy A. Roach and Kurt R. Casad, of counsel.

## OPINION

BRUGGINK, Judge.

### INTRODUCTION

Pending before the court is defendant's motion for summary judgment. It raises the question of whether *res judicata* bars plaintiffs from asserting that defendant's imposition of a "customer charge" in accordance with applicable electric power rate schedules constitutes a breach of plaintiffs' contracts for the purchase of electrical power. For the reasons discussed below, the motion is granted.

### BACKGROUND [1]

The Bonneville Power Administration ("BPA") is a self-financing agency within the United States Department of Energy that markets electrical power generated at federal dams in the Pacific Northwest throughout the States of Washington, Oregon, Idaho, and that part of Montana lying west of the Continental Divide. 16 U.S.C.

---

1. At oral argument, the court gave a preliminary ruling in favor of defendant, based on issue preclusion. The court requested defendant to prepare proposed findings and conclusions in conformity with the outline of an opinion furnished by the court to the parties. Defendant prepared draft findings and conclusions. Plaintiffs were given the opportunity to comment on the draft and did so. The background section included here is drawn heavily from defendant's draft findings, while the draft conclusions of law were relied on in part in the discussion section.

§§ 832, 838g, 839e(a)(1) (1988). Pursuant to statute, BPA is authorized to negotiate and enter into long-term contracts for the supply of electrical power, which are "[s]ubject to ... such rate schedules as the Secretary of Energy may approve" and which "contain ... such provisions as the [BPA] administrator and purchaser agree upon for the equitable adjustment of rates at appropriate intervals, not less frequently than once in every five years." 16 U.S.C. § 832d(a).

During 1980, Congress enacted the Pacific Northwest Electric Power Planning and Conservation Act ("Act"), 16 U.S.C. §§ 839–839h, to avoid what the Governor of Washington described as a "regional civil war" over the limited supply of low-cost electrical power generated at federal dams. *Central Lincoln PUD v. Johnson*, 735 F.2d 1101, 1106 (9th Cir.1984); *Public Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir.1982). This Act required BPA to offer its prior customers new long-term contracts for the supply of electrical power within nine months of passage of the Act, 16 U.S.C. §§ 839c(b), (d), (g), and to adhere to specified procedures in establishing power rates.

With respect to establishment of rates, the Act provided that BPA must: publish notice of its proposed rates in the Federal Register with a statement of justification supporting such rates; hold one or more hearings upon proposed rates, which include comments from the public; allow cross-examination of witnesses at such hearings; permit submission of written comments upon proposed rates; furnish an adequate opportunity for persons to offer rebuttal of material submitted by any person; and issue a final decision upon proposed rates, which establishes rates based upon the record developed. 16 U.S.C. § 839e(i)(1)–(5). The Act further provided that BPA's final decision on the proposed rates would become effective only upon confirmation and approval by the Federal Energy Regulatory Commission ("FERC"), 16 U.S.C. § 839e(i)(6), and that suits challenging "final actions" taken pursuant to the Act, such as BPA's establishment of power rates, must be filed in the United States Court of Appeals for the appropriate region, 16 U.S.C. § 839f(e). *See Central Lincoln PUD v. Johnson*, 735 F.2d at 1108–09.

During 1981, in accordance with the Act, BPA offered long-term power sales contracts to the three classes of customers it previously served: (1) publicly owned utilities; (2) investor owned utilities; and (3) companies purchasing large quantities of electrical power. The latter customer class is commonly referred to as "Direct Service Industries" or "DSIs" because its members, primarily aluminum manufacturers, purchase power directly from BPA, rather than a local utility. *See ALCOA v. Central Lincoln PUD*, 467 U.S. 380, 384, 104 S.Ct. 2472, 2476, 81 L.Ed.2d 301 (1984).

The basic terms of BPA's power sales contracts are identical within each respective customer class. *CP Nat'l Corp. v. Jura*, 876 F.2d 745, 749 (9th Cir.1989); *see* 46 Fed.Reg. 44,340 (1981). Plaintiffs, Commonwealth Aluminum Corporation, Kaiser Aluminum and Chemical Corporation, and Martin Marietta Corporation are DSIs or successors-in-interest to DSIs that entered into contracts with BPA pursuant to the Act. Each of the plaintiffs, therefore, has a contract with BPA providing that they will pay BPA for power supplied at the "rate specified in Exhibit A [to the contract], ..., including section 4 of the Wholesale Power Rate Schedule for Industrial Firm Power." Power Sales Contract Section 4(c).[2]

In 1983, two years after plaintiffs or their predecessors-in-interest entered into their contracts, BPA initiated formal rate-making proceedings to revise its wholesale power rates, including its industrial firm power ("IP") rate applicable to plaintiffs'

---

**2.** At page 246 of the 1983 Wholesale Power Transmission Rule Proposal Administrator's Record of Decision, the Administrator, discussing the DSI contracts generally, states that, according to the contracts, power will be supplied at the "rate specified in any rate schedule available ... for service of the class, quality and type provided for in th[eir] contracts," and cites sections 4(c) and 8(c).

contracts. *See* 48 Fed.Reg. 4027 (1983). During those proceedings, BPA indicated that its existing, two-part IP rate premised upon "energy" and "demand" would not result in revenues from the DSIs sufficient to cover BPA's costs. BPA, therefore, proposed a new IP rate for the DSIs consisting of the following three components:

(1) an energy charge based upon the amount of electric energy that a DSI actually used;

(2) a demand charge based upon the total amount of electric capacity that a DSI actually reserved;[3] and

(3) a customer charge based upon a DSI's forecasted operating demand.

*See Atlantic Richfield Co. ("Arco") v. BPA,* 818 F.2d 701, 704 (9th Cir.1987).

The DSIs and BPA's other customers then submitted testimony, legal briefs, and other materials setting forth their respective views upon the various rates proposed by BPA. After compiling an administrative record exceeding 28,000 pages, BPA's Administrator issued a 402–page "final decision." The decision stated, in part, the following:

The DSI's have argued that BPA is contractually impaired from implementing a customer charge in the IP–83 rate. Although they never seriously question BPA's need to maintain stable revenues in situations where customer loads fall below forecast levels, the DSI's would limit BPA to remedial rate designs expressly mentioned in their power sales contracts. This argument is premised on the so-called "Sierra–Mobile" contract cases. *FPC v. Sierra–Pacific Power Co.,* 350 U.S. 348 [76 S.Ct. 368, 100 L.Ed. 388] (1956), and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332 [76 S.Ct. 373, 100 L.Ed. 373] (1956). However, the DSI's have misinterpreted the Sierra–Mobile doctrine and their contracts. * * *

The DSI's argue that the Sierra–Mobile doctrine prohibits BPA from implementing any rate design change not expressly mentioned in their contracts. To do so, they claim, would be a unilateral change in those contracts. Prehearing Brief, DSI, 52–53. However, the doctrine is far less restrictive: "[The utility,] like the seller of an unregulated commodity, has the right in the first instance to change its rates as it will, unless it has undertaken by contract not to do so." *United Gas Pip Line Co. v. Memphis Light, Gas & Water Div.,* 358 U.S. 103, 113 [79 S.Ct. 194, 200, 3 L.Ed.2d 153] (1958). To prevail, the DSI's must establish that their contracts prohibit implementation of a customer charge.

The DSI contracts do not specify rate levels or rate design features. Instead, they merely incorporate by reference the currently effective industrial class rate established by the Administrator under the ... Act. * * * [C]ontractual references make clear that the DSI contracts are not rate-setting documents. Instead, they defer to the Administrator's authority under the ... Act to establish rates necessary to recover BPA's revenue requirement. * * *

One possible Sierra–Mobile argument remains. In the ... rate proceeding, the DSI's argued that the curtailment charge included in section 9 of their power sales contract was the only revenue stability feature lawfully includable in their rate. They apparently regard any additional rate design element as necessarily inconsistent. However, the language of the contract does not support any such narrow interpretation. Moreover, the customer charge and the curtailment charge are totally compatible revenue stabilizing elements of the IP–83 rate. * * * The two charges recover different portions of BPA's industrial class revenue requirement. There is no overlap or conflict between the two charges that might support any DSI allegation that the contractually specified curtailment charge precludes imposition of a customer charge.

---

3. "Capacity" is the maximum output of the BPA power system at a given moment in time. *Central Lincoln PUD v. Johnson,* 735 F.2d at 1121.

1983 Wholesale Power Transmission Rule Proposal Administrator's Record of Decision at 245–46. The Administrator thus adopted as final the IP rate with its three components.

On October 26, 1983, FERC ordered BPA's new power rates into effect on an interim basis, as of November 1, 1983. *U.S. Dept. of Energy, Bonneville Power Administration*, 25 Fed.Energy Reg. Comm'n Rep. (CCH) ¶ 61,140 (1983). Approximately two months later, on December 23, 1983, the DSIs, including plaintiffs, filed actions in the United States Court of Appeals for the Ninth Circuit alleging that the customer charge component of BPA's IP–83 rate constituted a "breach of contract." *Arco v. BPA*, Nos. 83–7971 and No. 83–7981 (9th Cir. filed December 23, 1983). On that same date, the DSIs also filed a complaint in this court, which alleged that the customer charge component of BPA's IP–83 rate constituted a "breach of contract." *Georgia Pacific Corp. v. United States*, No. 761–83C (Cl.Ct. filed December 23, 1983). The proceedings in this Court subsequently were suspended "pending issuance of a mandate in the United States Court of Appeals for the Ninth Circuit, case No. 83–7971, or any other dispositive action on that case." Order of Apr. 18, 1984.

In July of 1985, FERC granted final confirmation and approval to the IP–83 rate adopted by BPA's Administrator. *U.S. Dept. of Energy, Bonneville Power Administration*, 32 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,014 (1985). Within two months of FERC's decision, plaintiffs and the other DSIs filed additional petitions for review with the Ninth Circuit, *Arco v. BPA*, Nos. 85–7473 and 85–7488, which challenged the customer charge component of BPA's IP–83 rate as a violation of rights embodied in the DSIs' contracts. These petitions were consolidated with those filed by the DSIs in 1983.

In their opening brief before the Ninth Circuit, the DSIs stated that the questions presented by their appeal were as follows:

1. Does [BPA's] newly created "customer charge" violate the [DSIs'] power sales contracts, and, simultaneously, the statutes that require BPA's contracts to be binding in accordance with their terms because:

(a) the customer charge imposes additional charges for DSI curtailments beyond those permitted under the DSI contracts;

(b) the customer charge creates a third charge for electric power not permitted by the DSI contracts and BPA's governing statutes; and

(c) the customer charge itself is arbitrary and capricious and without rational basis?

2. Given that BPA has adopted the customer charge and no further administrative proceedings remain, does this Court have jurisdiction to review whether BPA has breached the DSI contracts and violated the agency's own governing statutes by adopting the customer charge?

DSI Opening Brief at 1. The DSIs summarized the purported impact of BPA's customer charge as follows:

BPA and the DSIs agreed to the curtailment rights contained in the 1975 and the current 1981 contracts in substantial part because both parties recognized the need for industrial customers to be able to respond to changing market conditions. When market conditions are adverse—for example when the world price of aluminum is below production costs—the DSIs cannot operate Northwest plants economically and must curtail operations or operate at a loss. Because such market swings were anticipated in the contract negotiations, BPA and the DSIs agreed that the DSIs would have the right to curtail 25% of their loads without penalty. In imposing the "customer charge," BPA unilaterally disavowed the fundamental compromise embodied in the contracts. Thus, BPA has abrogated contractual and statutorily protected rights that were essential to enable the DSIs to respond to varying market conditions.

*Id.* at 23. Thereafter, the DSIs argued as follows:

The 1981 contracts clearly set forth the right of each DSI to reduce, without penalty, up to 25% of its BPA power. The 1981 contracts also specify that if a DSI reduces its load further, the penalty BPA may impose is limited to a portion of the Demand charge. The customer charge imposes a new and inconsistent duty on the DSIs by imposing an additional penalty charge for curtailments, and in particular by charging for curtailments that are less than 25% of a DSI's load. The purpose and effect of the charge, a unilateral departure from the negotiated contracts, is to penalize a DSI that exercises its right to curtail purchases of power.

\* \* \* \* \* \*

"The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator has been a State or a municipality or a citizen." *Sinking Fund Cases*, 99 U.S. 700, 719 [25 L.Ed. 496] (1879). *Accord, Railway Labor Executives Association v. U.S.*, 575 F.Supp. 1554, 1556 at n. 10 (Regional Rail Reorg. Ct.1983), *cert. denied*, [465 U.S. 1101] 104 S.Ct. 1596 [80 L.Ed.2d 127] (1984). BPA negotiated and entered into the 1981 DSI contracts. BPA is bound by the terms of these contracts just as the DSIs are. The customer charge conflicts with the DSI contracts and must fail. *Id.* at 68, 74.

On June 3, 1987, the Ninth Circuit issued an opinion upon the DSIs' consolidated petitions, which stated, in part, that:

The DSIs also challenge the customer charges as a breach of contract. *See* 16 U.S.C. § 839f(e)(1)(B). Specifically, the DSIs contend that the customer charges were in substance a curtailment charge, forbidden by their agreement with BPA. We disagree. A curtailment charge is a charge imposed for curtailing one's demand for power below a certain level. A customer charge however, does not operate in this way. The customer charge, as discussed above, is a rate charged by BPA for the service of standing by with power on demand. The customer charge is the same whether a DSI has a high or low demand for power. We thus reject the breach of contract challenge to the customer charge.

*Arco v. BPA*, 818 F.2d at 705. Petition for rehearing and a suggestion for rehearing *en banc* were denied. Order of August 31, 1987.

After the Ninth Circuit rejected the DSIs' contention that BPA's customer charge breached the DSIs' contracts, the plaintiffs in *Georgia Pacific*, Cl.Ct. No. 761–83C, who were among the petitioners in *Arco*, voluntarily dismissed their Claims Court complaint. On February 5, 1988, however, the three plaintiffs here, who were plaintiffs in *Georgia Pacific* and petitioners in *Arco*, filed the present complaint with this court.

Plaintiffs allege in part as follows:

10. Section 4 of the Contracts governs the sale of power by BPA to Plaintiffs and the purchase of and payment for such power by Plaintiffs. It obligates BPA to sell to Plaintiffs and Plaintiffs to purchase from BPA an amount of power specified by Plaintiffs' Operating Demand, Curtailed Demand, or Restricted Demand, whichever is in effect from time to time. It also obligates Plaintiffs to pay BPA's rate charges for that amount of power. Operating Demand, Curtailed Demand and Restricted Demand are defined in the Contracts. Sections 5, 7 and 9 of the Contracts specify how the levels of these respective demands are set. The demand in effect under these Contract Sections will always be the lowest of Operating Demand, Curtailed Demand or Restricted Demand.

11. Section 9 of the Contracts governs the curtailment of Plaintiffs' power purchases from BPA. It gives each Plaintiff unilateral rights to reduce its respective power purchases from BPA and establish a new Curtailed Demand. It also specifies a formula for calculating the charge, if any, to be paid by Plaintiffs to

BPA for the exercise of the curtailment rights.

\*   \*   \*   \*   \*   \*

14. One charge in the IP–83 rate schedule was the "customer charge." \* \* \* [T]he IP–83 rate structure adopted by BPA would conform to Plaintiffs' Contract with BPA if BPA's forecasts of its power sales to Plaintiffs were not substantially overstated. If, however, Plaintiffs subsequently were to curtail their respective power purchases below 89.4 percent of the level of power purchases forecasted by BPA, the IP–83 rate schedule would provide for charges in excess of those permitted by the Contracts.

\*   \*   \*   \*   \*   \*

16. From time to time between July 1984 and June 1985, Plaintiffs exercised their curtailment rights as specified in the Contracts and reduced their demands substantially below the levels which had been previously forecasted by BPA. In each such month, BPA charged Plaintiffs for amounts in excess of the applicable Curtailed Demand established by Plaintiffs for the month.

17. In acting as alleged herein, and imposing the customer charge for amounts in excess of Curtailed Demand, the United States, acting through BPA and its Administrator, committed a material breach of Plaintiffs' Power Sales Contracts, including, but not limited to, Sections 4 and 9 thereof.

### DISCUSSION

Defendant has moved for summary judgment, arguing that this action is barred by the doctrine of *res judicata.* Defendant contends that the question of whether BPA's imposition of the customer charge violates plaintiffs' contracts was decided as a result of the Ninth Circuit's determination in *Arco* that the customer charge does not breach plaintiffs' contracts. Alternatively, defendant contends that plaintiffs' litigation of the question is barred by claim preclusion as a result of the Ninth's Circuit's entry of judgment in *Arco.* Because the court agrees with the former analysis,

it need not determine if plaintiffs' action is barred by claim preclusion.

■ Under the principle of *res judicata* known as issue preclusion, issues which are actually and necessarily determined by a court of competent jurisdiction are normally conclusive in a subsequent suit involving the parties to the prior litigation. *International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1090 (Fed.Cir. 1984); *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983); Restatement (Second) of Judgments § 27 (1980). A court generally will invoke issue preclusion if (1) the issue previously adjudicated is identical with that now presented, (2) the issue was "actually litigated" in the prior case, (3) the determination of that issue was necessary to the earlier judgment, and (4) the party being precluded was fully represented in the prior action. *Thomas v. GSA,* 794 F.2d 661, 664 (Fed.Cir.1986); *Mother's Restaurant, Inc.,* 723 F.2d at 1569; *Jarboe–Lackey Feedlots, Inc. v. United States,* 7 Cl.Ct. 329, 336 (1985).

Plaintiffs do not dispute that they were fully represented in the prior action. They do, however, dispute the other elements necessary for invocation of issue preclusion.

### A. *Identity of Issues*

■ Plaintiffs assert that the issue in this case is not identical to any issue presented in *Arco.* They contend that, in *Arco,* the Ninth Circuit decided only whether BPA's "establishment" of the customer charge breached their contracts, whereas here, their claim does not challenge establishment of the customer charge, but rather "the imposition of the customer charge by using it to calculate power bills...." Plaintiffs Brief In Opposition To Defendant's Motion For Summary Judgment at 11.

Whether an issue presented in an action is identical to an issue presented in a prior action is generally determined by comparing pleadings or other materials associated with both actions. *See, e.g., Mother's Restaurant, Inc.,* 723 F.2d at 1570; *State of Illinois v. United States,* 15 Cl.Ct. 399, 408

(1988). Here, a comparison of the pleadings and other materials in this action with those in *Arco* demonstrates that the question presented in this case is identical to one of the issues presented by plaintiffs in *Arco*.

The fundamental issue presented here is posed in the complaint: Whether by "imposing the customer charge for amounts in excess of Curtailed Demand, [BPA] committed a material breach of Plaintiffs' Power Sales Contracts, including, but not limited to, Sections 4 and 9 thereof." Complaint ¶ 7. The identical issue was raised repeatedly by plaintiffs in their petitions for review and briefs in *Arco*. In their *Arco* petitions, plaintiffs expressly argued that the customer charge "conflicts with and violates the rights of the DSIs as embodied in, among others, Sections 4, 5, 9 and 13 of the DSIs' statutory power sales contracts and Section 8 of the General Contract Provisions of the DSIs' statutory power sales contracts." Petition For Review ¶ 14. Further, with respect to the curtailment charge, plaintiffs specifically asserted in their petitions that "Section 9 'Curtailment by the Purchaser' provisions ... are the exclusive provisions governing curtailment by the DSIs of electric power delivered by BPA under the statutory power sales contracts." Plaintiffs added that:

> [W]ithout consent or agreement of any of the DSIs, BPA unilaterally announced its decision that the DSIs would not be able to curtail in accordance with their contracts and that BPA was imposing new and different curtailment rights and duties upon the DSIs. BPA denominated these new curtailment provisions the "customer charge."

*Id.* ¶ 9. Plaintiffs thus specifically alleged in their *Arco* petitions that the customer charge component of BPA's IP–83 rate was contrary to Section 9 and other terms of their power sales contracts.

In their *Arco* briefs, plaintiffs also repeatedly made clear that one of the central issues they were raising before the court was whether the customer charge breached the power sales contracts by conflicting with the express terms of those contracts.

In their opening brief, plaintiffs argued that section 9 of their power sales contracts, captioned "Curtailment by the Purchaser," was the exclusive provision governing charges for curtailment by DSIs of electric power delivered by BPA. Plaintiffs added that "[t]he customer charge imposes a new and inconsistent duty on the DSIs by imposing an additional penalty charge for curtailments, and in particular by charging for curtailments that are less than 25% of a DSI's load." DSI Opening Brief at 26. In fact, plaintiffs repeatedly asserted in their briefs that BPA's customer charge violated the agreements that BPA and the DSIs negotiated in the DSIs' 1981 contracts.

That plaintiffs contended in *Arco* that the customer charge component of BPA's IP–83 rate was contrary to their power sales contracts is specifically confirmed by the Ninth Circuit's decision in that case. The Ninth Circuit summarized the allegations of the DSIs in its opinion as follows:

> The DSIs allege that the customer charge ... constitutes a breach of their contracts with BPA.
>
> \*   \*   \*   \*   \*   \*
>
> [The DSIs] assert that it is a charge for refusing power that violates their contracts with BPA.
>
> \*   \*   \*   \*   \*   \*
>
> The DSIs also challenge the customer charges as a breach of contract. See 16 U.S.C. § 839f(e)(1)(B). Specifically, the DSIs contend that the customer charges were in substance a curtailment charge, forbidden by their agreement with BPA. We disagree.

*Arco*, 818 F.2d at 702, 705. Thus, contrary to plaintiffs' assertion, they expressly presented to the Ninth Circuit the present issue of whether imposition of the customer charge in the IP–83 rate schedule, for amounts in excess of Curtailed Demand, "constituted a material breach of Plaintiffs' Power Sales Contracts, including, but not limited to, Sections 4 and 9 thereof."

Plaintiffs' attempt to distinguish between the issue presented here and the one presented in *Arco* by claiming that *Arco*

concerned only establishment, and not imposition, of the customer charge fails. A determination by the Ninth Circuit that a charge established in the IP rate schedule constitutes a lawful charge in accordance with plaintiffs' contracts is equivalent to a determination that BPA can utilize that IP rate in billing plaintiffs for power purchased during the period that rate is effective. Accordingly, the issue litigated in *Arco*—whether the customer charge contained in the IP–83 rate schedule constituted a breach of plaintiffs' power sales contracts—is identical to the issue raised by plaintiffs in the instant case.

### B. *Actual Litigation of Issue*

Plaintiffs also contend that, even if the issue in this case is identical to the one in *Arco,* issue preclusion cannot be invoked because the issue was not "actually litigated" in *Arco.* Whether an issue was "actually litigated" in a prior action, however, is generally determined by ascertaining whether the parties to the original action disputed the issue and whether that issue subsequently was resolved by the court entertaining the action. *E.g., Mother's Restaurant Inc.,* 723 F.2d at 1570; *Mosely v. United States,* 15 Cl.Ct. 193, 196 (1988). *See also Chromalloy Am. Corp. v. Kenneth Gordon (New Orleans), Ltd.,* 736 F.2d 694, 697 (Fed.Cir.1984). As discussed above, the Ninth Circuit specifically states in its *Arco* decision that the DSIs raised the question of whether the customer charge breaches the power sales contracts. That question was resolved. *Arco,* 818 F.2d at 705. Accordingly, the issue raised here was "actually litigated."

### C. *Was The Issue Necessary To The Judgment?*

Plaintiffs finally contend that, even if the issue presented here is identical to that in *Arco* and was actually litigated before the Ninth Circuit, issue preclusion cannot be invoked because the Ninth Circuit's resolution of that issue was not necessary to its judgment. Initially, plaintiffs assert that the court's judgment in *Arco* could have been grounded upon an issue other than the one which defendant seeks to preclude.

Next, they assert that, in any event, resolution of the breach of contract claim was beyond the jurisdiction of the Ninth Circuit and, thus, any resolution of the issue could not have been essential to the court's judgment.

According to plaintiffs, the Ninth Circuit could have rejected the breach of contract challenge to the customer charge upon any of five different theories which would not have precluded their claims in this case. That conclusion cannot be supported.

First, plaintiffs assert that the Ninth Circuit found that the customer charge was a rate, and appears to have rejected the DSIs' breach of contract challenge on that basis alone. The express language of the Ninth Circuit's decision belies plaintiffs' assertion. The breach of contract was separately addressed, albeit briefly, after the court addressed the lawfulness of the IP–83 rate. *Arco,* 818 F.2d at 705.

Plaintiffs' second theory is that the Ninth Circuit accepted BPA's forecasted sales to the DSIs and that there could be no breach if actual sales matched forecasted sales. This also conflicts with the express language of the opinion. The court did not consider operation of the customer charge simply in the context of BPA's forecasted sales, but in varying contexts, including sales below those forecasted. *Id.* at 705.

The third theory advanced by plaintiffs—that the issue was based upon "contingent future events" and that the Ninth Circuit may have decided simply that the issue was not ripe for review—finds no support in the Ninth Circuit's opinion. The Ninth Circuit gave no indication that it was refraining from resolving plaintiffs' breach of contract claim. Rather, as explained above, it specifically examined plaintiffs' breach of contract claim and found that there were no circumstances concerning the level of power purchased in which BPA's customer charge would breach the DSIs' contracts. *Id.*

Plaintiffs' fourth theory is that the Ninth Circuit might have concluded that it had no authority to set aside agency action on the basis of asserted rights created within the

body of a government contract. This theory too finds no support in the Ninth Circuit's opinion. The court never refused in its opinion to set aside the customer charge because it lacked authority to do so. Rather, the court expressly, (a) determined that it had authority to review the consistency of the customer charge with the contracts, (b) reviewed the consistency of the customer charge with the contracts, and (c) concluded that it must reject plaintiffs' breach of contract challenge to the customer charge. *Arco*, 818 F.2d at 704–05.

The fifth theory advanced by plaintiffs must also be rejected. They contend the court might have concluded that any alleged contractual limitations upon the broad scope of BPA's statutory ratemaking discretion would be void and thus all contractual challenges to BPA's rates would be rejected. The expressly stated basis for the Ninth Circuit's judgment in *Arco*, however, was that the customer charge was consistent with plaintiffs' contracts, not that a contract could never impair BPA's ratemaking authority. *Arco*, 818 F.2d at 705.

Since the Ninth Circuit's opinion expressly refutes plaintiffs' assertions that the court's judgment in *Arco* could have been determined upon any of five bases, and because it demonstrates that the court expressly rejected plaintiffs' breach of contract assertion, *id.*, the Ninth Circuit's resolution of the breach issue clearly was grounded upon the issue which defendant seeks to preclude. *See Mothers Restaurant, Inc.*, 723 F.2d at 1571 n. 8.

■ As a final attempt to avoid the import of the Ninth Circuit's decision, plaintiffs contend that resolution of the breach of contract claim was beyond the jurisdiction of the Ninth Circuit and, therefore, any resolution of the issue in *Arco* could not have been essential to the court's judgment. It is true that "Incidental" or "collateral" determination of a nonessential issue will not preclude reconsideration of that issue in later litigation. *Mothers Restaurant, Inc.*, 723 F.2d at 1571, *citing* Restatement (Second) of Judgments § 27 comment h (1980). As discussed above, how-

ever, the question of whether the customer charge contained in the IP–83 rate schedule constituted a breach of plaintiffs' power sales contracts was not incidental or collateral to the Ninth Circuit action. Rather, it was one of the principal issues plaintiffs presented in their petitions for review and in their briefs before the Ninth Circuit.

■ Moreover, whether the Ninth Circuit erroneously exercised jurisdiction over plaintiffs' claims in *Arco* is irrelevant because the appropriateness of the Ninth Circuit's exercise of jurisdiction was expressly raised by plaintiffs in *Arco*, and the court specifically determined that it had jurisdiction over the 1985 petitions and the merits of the issues raised. Plaintiffs contended there that review of the breach of contract issue by the Ninth Circuit was consistent with the Tucker Act:

The Tucker Act provides that the Claims Court has exclusive jurisdiction for claims over $10,000 against the United States founded "upon any express or implied contract with the United States." 28 U.S.C. § 1346(a), 1491. However, not every case "requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Megapulse Inc. v. Lewis*, 672 F.2d 959, 968 (D.C.Cir.1982) (emphasis omitted). Where—as here—both contracts and statutory duties are involved the Tucker Act does not preclude jurisdiction outside the Claims Court for review of statutory duties. *Rowe v. United States*, 633 F.2d 799 (9th Cir.1980), *cert. denied*, 451 U.S. 970 [101 S.Ct. 2047, 68 L.Ed.2d 349] (1981).

DSI Opening Brief at 49.

In light of this discussion by the DSIs, it is fair to say that the Ninth Circuit implicitly adopted the view urged by plaintiff and held that it possessed jurisdiction.

In any event, the Supreme Court has taught that even a court's erroneous exercise of subject matter jurisdiction is not subject to collateral attack. *See Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988); *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S.

371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *see also Doko Farms v. United States*, 861 F.2d 255 (Fed.Cir.1988). In *Baxter State Bank*, the Court explained that a "court has the authority to pass upon its own jurisdiction and its decree sustaining jurisdiction against attack, while open to direct review, is *res judicata* in a collateral action." 308 U.S. at 377, 60 S.Ct. at 320. This principle was reaffirmed by the Supreme Court in *Insurance Corp. of Ireland v. Compagnie Des Bauxites*, 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2104 n. 9, 72 L.Ed.2d 492 (1982):

> A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon an adverse judgment. It has long been the rule that principles of res judicata apply to jurisdictional determinations— both subject matter and personal. *See Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 [60 S.Ct. 317, 84 L.Ed. 329] (1940); *Stoll v. Gottlieb*, 305 U.S. 165 [59 S.Ct. 134, 83 L.Ed. 104] (1938).

The cases relied upon by plaintiffs which have allowed a collateral attack on a prior judgment based upon a jurisdictional defect all involve a clear usurpation of power by a court, not an error of law in determining whether the court had jurisdiction. "[A] court will be deemed to have plainly usurped jurisdiction only when there is a 'total want of jurisdiction' and no arguable basis on which it could have rested a finding that it had jurisdiction." *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir.1986), *citing Lubben v. Selective Service System Local Board No. 27*, 453 F.2d 645, 649 (1st Cir. 1972); *see also Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1103 (D.C.Cir.1988).

Here, plaintiffs presented to the Ninth Circuit an arguable statutory basis upon which that court could determine to exercise jurisdiction over the breach issue. *See Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *CP National Corp. v. Jura*, 876 F.2d at 748; *Kansas City Southern Railway Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 826 (8th Cir.1980), *cert. denied* 449 U.S.

955, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). Plaintiffs clearly are precluded from contending that the *Arco* judgment is void for lack of an arguable basis.

## CONCLUSION

Plaintiffs are barred from litigating in this court issues necessarily raised and resolved in *Arco*. Defendant's motion for summary judgment, therefore, is granted. The Clerk is directed to dismiss the complaint.