**PUGET SOUND POWER & LIGHT CO.**

v.

**The UNITED STATES.**

No. 90–193C.

United States Claims Court.

April 30, 1991.

Sherilyn Peterson, Bellevue, Wash., Atty. of Record, for plaintiff.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

YOCK, Judge.

This case, involving a challenge to the Bonneville Power Administration's extraregional sales of surplus power (electricity) outside of the Pacific Northwest states, is currently before the Court on the Government's motion to dismiss for lack of subject matter jurisdiction. After oral argument, and for the reasons discussed herein, the Government's motion is granted, but in lieu of dismissal, the complaint is to be transferred to the United States Court of Appeals for the Ninth Circuit pursuant to 28 U.S.C. § 1631 (1988).

## FACTUAL BACKGROUND

The plaintiff, Puget Sound Power and Light Company (Puget) is an investor-owned utility company that provides electric service to retail customers located within the state of Washington. Its principal place of business is Bellevue, Washington. The Bonneville Power Administration

(BPA) is an agency of the United States, established within the Department of Energy. 16 U.S.C. §§ 832 et seq. (1988)[1] and 42 U.S.C. §§ 7101 et seq. BPA is a marketing agency that sells (generally wholesale) electrical power generated at federal dam sites located throughout the Pacific Northwest states of Washington, Oregon, Idaho, and that part of Montana lying west of the Continental Divide. 16 U.S.C. §§ 832, 838g, 839e(a)(1). Pursuant to statute, BPA is authorized to negotiate and enter into long-term contracts for the supply of electrical power, which are "[s]ubject to * * * such rate schedules as the Secretary of Energy may approve" and which "contain * * * such provisions as the [BPA] administrator and purchaser agree upon for the equitable adjustment of rates at appropriate intervals, not less frequently than once in every five years." 16 U.S.C. § 832d(a). Between 1976 and 1988, Puget entered into such contracts for the wholesale purchase of federal electrical power.

In order to fully understand the decision in this case, it is important to have a general comprehension of the statutory and regulatory framework in which this case arises.

As work progressed in the 1930's upon the "Bonneville Project" being constructed by the U.S. Army Corps of Engineers along the main stem of the Columbia River, the method and priority for distributing electrical power generated by that project became the subject of intense public debate. Public power advocates sought to have Congress (1) grant preference to publicly-owned utilities in obtaining power from the project and (2) establish a body with powers similar to those of the Tennessee Valley Authority to operate the dams. E.g., S.Rep. No. 689, 74th Cong., 1st Sess. (1935); H.R.Rep. No. 2790, 74th Cong., 1st Sess. (1935). Private power interests, on the other hand, advocated a more limited federal role with project operation and power sales controlled solely by the Corps. Bonneville Power Administration, Columbia River Power For The People: A History of Policies of the Bonneville Power

---

1. Unless stated otherwise, all references to the statutes at issue will be 1988.

*Administration,* 79–80 (1981) (BPA History).

When Congress acted upon this matter in 1937, it did not adopt the positions advocated by the public or the private power interests, but instead enacted a compromise. Bonneville Project Act of 1937, 50 Stat. 731, 16 U.S.C. §§ 832–832d. Congress specified that the first priority for the purchase of electricity from the Bonneville Project was to be given to "public bodies and cooperatives," *i.e.,* "[s]tates, public power districts, counties, and municipalities," 16 U.S.C. §§ 832, 837, and that a new agency, the BPA, be created to market electric power generated from the operation of the Bonneville Project throughout the states of Washington, Oregon, Idaho, and that part of Montana lying west of the Continental Divide. Congress, however, allowed the Corps to retain sole responsibility for the daily operation of the dams and construction of additional hydroelectric projects in the Pacific Northwest. 16 U.S.C. § 832a(a); *see generally,* BPA History, at 55–62.

Because of the Corps's massive development of federal dams in the Pacific Northwest during the 1930's and 1940's, BPA had an abundance of low cost federal hydropower for many years. H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. II at 27 (1980), *reprinted in* 1980 U.S.Code Cong.

& Ad.News 6023, 6024–6025. This allowed BPA to not only satisfy the needs of its preference customers, *i.e.,* government agencies and publicly-owned utilities, but to enter into contracts for the sale of power to investor-owned utilities (IOU's) and to privately-owned, electro-process industries, such as aluminum companies, which utilize large quantities of electrical power. *Id.* Thereafter, the electro-process industries that received power from BPA became known as direct service industrial customers (DSI's) because they purchased large quantities of wholesale electrical power directly from BPA, rather than purchasing retail power from an IOU. *See Aluminum Co. of America v. Central Lincoln Peoples' Util. District,* 467 U.S. 380, 384, 104 S.Ct. 2472, 2476, 81 L.Ed.2d 301 (1984) (hereinafter *ALCOA v. Central Lincoln PUD).*

Initially, BPA entered into contracts with DSI's and IOU's for the sale of firm power.[2] *Id.* In 1948, however, the increasing demand for power in the Northwest caused BPA to modify its industrial sales policy to require that, whenever feasible, a new contract signed with a DSI would provide that some portion of the power sought would only be supplied as nonfirm energy.[3] *Id.*

By the late 1960's, BPA and virtually all of its customers believed that the abun-

---

2. Firm power is an uninterrupted supply of energy, which is available on demand and subject only to contractual limitation. *See ALCOA v. Central Lincoln PUD,* 467 U.S. at 384, 104 S.Ct. at 2476; Mellem, *Darkness to Dawn? Generating And Conserving Electricity In The Pacific Northwest: A Primer On The Northwest Power Act,* 58 Wash.L.Rev. 245, 251 n. 47 (1983).

BPA measures its ability to produce firm power, *i.e.,* an uninterrupted supply of energy, based upon the assumption that its hydroelectric generators will produce no more energy than they did during the worst actual water flow conditions in the Columbia River watershed, *i.e.,* the 42½ month period between August 16, 1928 and February 1932. Since hydroelectric power is generated at Columbia River dams when gravity pulls the runoff from annual rains and melting mountain snows through generators on the river's downstream path toward the Pacific Ocean, thereby turning the generators, this period of worst actual water flow is referred to as the "critical period." Mellem, *id.,* at 270.

3. Nonfirm energy is energy in excess of that which BPA can reliably plan on producing based upon the historical critical period. *Central Lincoln PUD v. Johnson,* 735 F.2d 1101, 1112 (9th Cir.1984). Nonfirm energy, therefore, is available only upon an intermittent basis. *See id.; ALCOA v. Central Lincoln PUD,* 467 U.S. at 384–85, 104 S.Ct. at 2476–77.

Electric utility companies, whether owned by investors or the public, must be ready to meet demand for electric service continuously. *Id.* at 385, 104 S.Ct. at 2477; *West Texas Util. Co. v. Texas Elec. Serv. Co.,* 470 F.Supp. 798, 807 (N.D. Tex.1979). Energy which is available only intermittently, therefore, is not of as great a value to a utility as firm energy. *ALCOA v. Central Lincoln PUD,* 467 U.S. at 387–88, 104 S.Ct. at 2478–79.

However, DSI's, that are principally manufacturers of aluminum, are unique among BPA's customers. *Id.* at 385, 104 S.Ct. at 2477. They readily accept nonfirm energy since their industrial processes can withstand periodic power interruptions. *Id.*

dance of cheap federal hydropower in the Pacific Northwest was coming to an end, because there were no economically and environmentally acceptable sites for the construction of additional large-scale, federal hydroelectric projects in the region. Additional hydroelectric projects were essential, since projected increases in electrical consumption for the region indicated that current generating capacity would soon be exhausted. H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. II at 28 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 6023, 6025–26. BPA, therefore, announced in 1973 that its power sales to IOU's would cease later that year, with the expiration of the IOU's 20–year contracts, since BPA believed it would need power previously sold to the IOU's to serve its preference customers' growing needs. *Id.* at 29, *reprinted in* 1980 U.S.Code Cong. & Ad. News 6027; H.R.Rep. No. 976, 96th Cong., 2d Sess. pt. I at 24 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 5989, 5990. Further, BPA announced in 1976 that, for the same reason, it was unlikely that it would be able to renew its power sales contracts with the DSI's when they expired during the period 1981 through 1991. *Id.; ALCOA v. Central Lincoln PUD,* 467 U.S. at 385, 104 S.Ct. at 2477.

When BPA ceased providing inexpensive federal power to the IOU's in 1973, the rates charged by the IOU's to residential customers increased by as much as 300 percent. H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. II at 29, *reprinted in* 1980 U.S. Code Cong. & Ad.News 6023, 6027. As a result, governments representing areas served by the IOU's attempted to obtain BPA's less expensive power for their constituents by creating public entities, which they claimed were entitled to preference from BPA, or by employing other methods. *E.g.,* H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. II at 30, *reprinted in* 1980 U.S. Code Cong. & Ad.News 6023, 6028; *ALCOA v. Central Lincoln PUD,* 467 U.S. at 385, 104 S.Ct. at 2477. Moreover, 10 of the 15 DSI's served by BPA claimed that, if they were deprived of direct service from BPA when their contracts expired, they were entitled to similar service from the preference utility which served their locality. H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. I at 25, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5989, 5991.

In 1980, in order to avoid years of litigation and what the Governor of Washington described as a "regional civil war" over low-cost power, Congress enacted the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (hereinafter the Northwest Power Act). *Commonwealth Aluminum Corp. v. United States,* 19 Cl.Ct. 300, 302 (1990); H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. I at 27, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5989, 5993. This Act granted BPA authority to acquire additional power resources, 16 U.S.C. § 839d, and to initiate measures designed to conserve electricity in the Pacific Northwest. 16 U.S.C. §§ 839b, 839d, and 839f(j); *Central Lincoln PUD v. Johnson,* 735 F.2d 1101, 1107 (9th Cir.1984).

To avoid disputes over the allocation of power, the Act specified that, within nine months of its effective date, BPA was to enter into an initial set of contracts with each customer previously served. 16 U.S.C. §§ 839c(b), (d), and (g); *ALCOA v. Central Lincoln PUD,* 467 U.S. at 386, 104 S.Ct. at 2477; *Commonwealth Aluminum,* 19 Cl.Ct. at 302. For example, section 5 of the Act provided that, "the Administrator shall offer * * * to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of 'industrial firm power.'" 16 U.S.C. § 839c(d)(1)(B); *see* 16 U.S.C. § 839c(g)(1).

Other provisions of the Act address virtually every one of BPA's responsibilities as a federal power marketing agency. The Act specifies principles governing not only the sale of power, but the establishment of rates, administration of regional preferences for extraregional power sales, and methods for obtaining administrative and judicial review of BPA's actions. 16 U.S.C. §§ 839c, 839e, 839f(c), 839f(e).

Section 5 of the Northwest Power Act, 16 U.S.C. § 839c, governs sales of power to BPA's customers both inside and outside of the Pacific Northwest. Section 5(b)(1) of the Act authorizes BPA to offer to sell power to Pacific Northwest publicly-owned and investor-owned utilities to meet their firm power needs to the extent such needs exceed their own resources used to serve their regional firm power loads. 16 U.S.C. § 839c(b)(1). Section 5(f) of the Northwest Power Act, 16 U.S.C. § 839c(f), further authorizes BPA to sell "surplus power" to BPA's customers both inside and outside the Pacific Northwest. Section 5(f) provides that:

The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Projects Act of 1937 (16 U.S.C. § 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. § 838 and following), and the Act of August 31, 1964 * * *.

Section 7 of the Northwest Power Act, 16 U.S.C. § 839e, governs the establishment of BPA's rates for the sale of electric power and for the transmission of nonfederal power over the federal transmission system. Section 7(a)(1) of the Act requires that BPA periodically review and revise its rates in order to recover BPA's costs. 16 U.S.C. § 839e(a)(1). It provides that:

The Administrator shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised

to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.

*Id.*[4] Section 7(i) of the Act further requires that BPA establish its rates based upon formal evidentiary hearings before a hearing officer. 16 U.S.C. § 839e(i). Section 7(i) provides that, when establishing rates, BPA's Administrator must (1) publish notice of the proposed rates in the Federal Register with a statement of justification supporting such rates, (2) have a hearing officer hold one or more hearings to develop a full and complete record including public comments related to the proposed rates, (3) allow submission of written comments upon the proposed rates, (4) furnish an adequate opportunity for persons to offer rebuttal of material submitted by any person, (5) allow for cross-examination, and (6) issue a final decision after conducting the hearing and submission of comments which establishes rates based upon the record developed. 16 U.S.C. §§ 839e(i)(1)–(5).

Also, section 7 of the Act requires that the Federal Energy Regulatory Commission (FERC) review BPA's rates. Section 7(a)(2) specifies that FERC must ascertain whether BPA's rate revenues are sufficient to meet BPA's total system costs and assure repayment of the federal investment in the Federal Columbia River Power System.[5] 16 U.S.C. § 839e(a)(2). Section 7(k) further specifies that BPA's rates for sales

**4.** Similar obligations are imposed upon BPA by section 6 of the Bonneville Project Act, 16 U.S.C. § 832e, and section 9 of the Federal Columbia River Transmission Act, 16 U.S.C. § 838g.

**5.** As other federal dams and transmission lines were built on the Columbia, the combined generation and transmission facilities became known as the Federal Columbia River Power System. Today, BPA markets power from some

30 federal hydroelectric projects. BPA also markets electric power generated at two nuclear plants in the Pacific Northwest—100 percent of the power from the Washington Public Power Supply System Plant No. 2, and 30 percent of the power from the Trojan Nuclear Project. BPA's hydroelectric and nuclear capacity have now been integrated into a single power supply system.

of nonfirm energy outside the Pacific Northwest may be subject to an additional hearing before FERC, 16 U.S.C. § 839e(k), and that FERC must review BPA's nonfirm energy rates for compliance with the rate-making standards of the Bonneville Project Act, the Flood Control Act of 1944, and the Federal Columbia River Transmission System Act. *Id.* Section 7(i)(6) expressly provides that BPA's rates only become effective upon interim or final approval by FERC. 16 U.S.C. §§ 839e(a)(2), (i)(6); *Commonwealth Aluminum,* 19 Cl.Ct. at 302.

Section 9(c) of the Northwest Power Act addresses regional preference. 16 U.S.C. § 839f(c). It provides that the conditions of sections 2 and 3 of the Regional Preference Act, 16 U.S.C. §§ 837–837h, apply to all BPA sales of surplus energy and peaking capacity outside the Pacific Northwest. *Id.*; 16 U.S.C. §§ 837a, 837b. It also provides that BPA can sell outside the Pacific Northwest only surplus energy and surplus peaking capacity. 16 U.S.C. § 839f(c); *see also* 16 U.S.C. § 839c(f).

Section 9(c) establishes definitions for the terms governing regional preference. In conjunction with 16 U.S.C. § 839a(14), it defines the term "Pacific Northwest" as a specific geographical area. *See* 16 U.S.C. § 839f(c). It defines the term "surplus energy" as "electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy." *Id.* It defines the term "surplus peaking capacity" as "electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity." *Id.*

Section 9(e) of the Northwest Power Act governs judicial review of final actions under the Northwest Power Act and the Regional Preference Act. Section 9(e)(1) expressly provides a list of final actions subject to judicial review under the provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706. Section 9(e)(1) reads in pertinent part:

**(e) Judicial review; suits**

(1) For purposes of sections 701 through 706 of Title 5, the following ac-tions shall be final actions subject to judicial review—

\* \* \* \* \* \*

(B) sales, exchanges, and purchases of electric power under section 839c of this title;

\* \* \* \* \* \*

(G) final rate determinations under section 839e of this title; and

\* \* \* \* \* \*

16 U.S.C. § 839f(e)(1). This list of actions, however, is not exhaustive and does not preclude judicial review of other actions by BPA. 16 U.S.C. § 839f(e)(3). Section 9(e)(5) of the Act further expressly pro-vides that suits challenging any final action under the Act, including those brought pur-suant to the Regional Preference Act, are subject to the exclusive jurisdiction of the United States Court of Appeals for the Ninth Circuit. Section 9(e)(5) of the Act reads in pertinent part:

(5) Suits to challenge the constitution-ality of this chapter, or any action there-under, final actions and decisions taken pursuant to this chapter by the Administ-rator or the Council, or the implementa-tion of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. §§ 837–837h), or the Federal Co-lumbia River Transmission System Act (16 U.S.C. § 838 and following), *shall* be filed in the United States court of ap-peals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments

thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5) (emphasis added).

After President Carter signed the Northwest Power Act in December of 1980, BPA promptly began the statutorily-mandated administrative process necessary to develop generic power sales contracts for all classes of its customers. BPA published a notice in the Federal Register outlining the public involvement process for development of the contracts; held public meetings to receive comments upon contract issues; announced in the Federal Register the availability of draft prototype power sales contracts and the period for comment upon those drafts; scheduled public meetings to receive comments from individuals throughout the Pacific Northwest; and conducted negotiations with interested parties. 46 Fed.Reg. 18,331 (Mar. 24, 1981), 23,287 (Apr. 24, 1981), 31,238 (June 12, 1981). Following these negotiations, receipt of comments, and public meetings, BPA offered generic power sales contracts to each class of its customers on August 28, 1981.[6] 46 Fed.Reg. 44,340 (Sept. 3, 1981); *see ALCOA v. Central Lincoln PUD,* 467 U.S. at 387, 104 S.Ct. at 2478; *Commonwealth Aluminum,* 19 Cl.Ct. at 302. Numerous BPA utility customers, including Puget and various DSI's, executed power sales contracts offered pursuant to this provision. *Pub. Power Council v. Johnson,* 589 F.Supp. 198, 200 (D.Or.1984).

Between 1976 and 1988, Puget entered into contracts with BPA for the purchase of federal electrical power for resale to its customers. Each of Puget's BPA contracts included generic provisions called General Exchange Provisions or General Contract Provisions, which contained the following provisions or virtually identical provisions:

(a) The provisions of sections 9(c) and (d) of Public Law 96–501 and the provisions of Public Law 88–552 as amended by section 8(e) of Public Law 96–501 ("the Provisions") are by this reference incorporated herein.[7]

(b) To further the policy of the Provisions, Bonneville agrees that the Utility, together with other utilities in the Pacific Northwest, shall have priority on electric power and energy Bonneville has available for sale, in conformity with the Provisions.

(c) Bonneville agrees that it will comply with all restrictions and requirements of the Provisions, and will perform all duties and obligations imposed on it by the Provisions, as the Provisions existed on the effective date of this agreement, regardless of any subsequent modification, amendment or repeal of the Provisions.

(d) Bonneville further agrees that, to the extent and at such times as may be necessary to meet demands for energy or peaking capacity at any established rate for use within the Pacific Northwest, it will exercise its rights, under contractual provisions required by the Provisions to be included in contracts for the disposition of surplus energy or surplus peaking capacity for use outside of the Pacific Northwest, to require:

(1) the return of energy delivered in connection with its supplying peaking capacity for use outside the Pacific Northwest; and

(2) the delivery within the Pacific Northwest of energy, peaking capacity, or both, which Bonneville has the right to receive in any exchange for energy, capacity, or both, which it has delivered for use outside the Pacific Northwest.

---

**6.** The Administrator's actions in developing the DSI generic contracts subsequently were challenged by BPA's preference customers. The Supreme Court of the United States, however, upheld the Administrator's actions in *ALCOA v. Central Lincoln PUD,* 467 U.S. at 380–406, 104 S.Ct. at 2474–88.

**7.** Pub.L. No. 96–501 is known as the Northwest Power Act, 16 U.S.C. § 839f(c), and Pub.L. No. 88–552 is known as the Regional Preference Act, 16 U.S.C. §§ 837–837h.

Puget's contract with BPA, No. 14–03–37050, executed prior to the Northwest Power Act, contains General Exchange Provisions (GEP's) which incorporate the Regional Preference Act, 16 U.S.C. §§ 837–837h, by reference. Puget's contracts with BPA executed after the Northwest Power Act contain GEP's or General Contract Provisions (GCP's) which incorporate the Regional Preference Act, 16 U.S.C. §§ 837–837h, and sections 9(c) and 9(d) of the Northwest Power Act, 16 U.S.C. § 839f(c) and (d), by reference.

During the past 10 years, BPA has marketed surplus power inside and outside the Pacific Northwest pursuant to section 5 of the Northwest Power Act, 16 U.S.C. § 839c, at rates established pursuant to section 7 of the Act, 16 U.S.C. § 839e. Puget has consistently opposed such extraregional sales by submitting letters in opposition to BPA, claiming that BPA is marketing power outside the region (mainly to California) in a manner inconsistent with the Regional Preference Act and the Northwest Power Act.

On February 23, 1990, BPA published a notice in the Federal Register announcing the initiation of a public notice administrative process to develop a formal policy governing BPA's sales of surplus power outside the Pacific Northwest region. 55 Fed. Reg. 6420 (Feb. 23, 1990). In this notice, BPA identified three broad categories of issues it wished to address in the policy development. *Id.* BPA also solicited comments from the public regarding the scope of these issues and whether other issues should be identified and included in the policy development. *Id.*

The notice identified the following issues to be addressed:

1. Should the definition of "energy requirements of any Pacific Northwest customer" and "electric power requirements of any Pacific Northwest customer" as used in the Northwest Preference Act and the Northwest Power Act be further defined? What definition should BPA use in determining the future energy or power requirements of PNW customers? What types of loads should be included and should any type of load be excluded?

2. Should BPA further define the terms "the lack of a market therefor at any established rate" and "for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy" as used in section 1(c) of the Northwest Preference Act and section 9(c) of the Northwest Power Act, respectively? Does BPA's price flexibility have an effect upon BPA's determination of whether there is a market for electric energy or capacity in the PNW? Does BPA's price flexibility affect BPA's determination of the energy requirements or the electric power requirements of any Pacific Northwest customer?

3. What standard should BPA adopt for federal system reliability of service to PNW loads and availability of federal power for use in the PNW? Should this standard of reliability include the purchase of power or acquisition of resources to support the standard?

*Id.* The Federal Register Notice also identified BPA's reasons for commencing the policy development as follows:

In most years BPA has significant quantities of surplus nonfirm energy available. Also in periods where BPA firm energy resources exceed firm energy loads, surplus firm energy is available. * * *

The timing, amounts, and other conditions under which BPA markets this surplus energy constitute specific marketing practices interpreting applicable statutory provisions in particular conditions and circumstances. Since a number of BPA customers are affected by these marketing practices, it is appropriate for BPA to periodically review them if conditions and circumstances change. The gradual decline in the amount of surplus firm power available in the Pacific Northwest and available to BPA in the past year constitutes such a change. BPA proposes to conduct a review of its practices and develop a policy on key issues

affecting sales of surplus firm power and nonfirm energy.

*Id.* BPA added in the notice that:

The priority of Northwest utilities to purchase surplus firm power and non-firm energy prior to BPA selling to out of region utilities has been a concern of BPA's customers. BPA has received comments regarding its past and planned sales of surplus firm power and nonfirm energy from its customers, including statutory and contractual administration of BPA's sales * * *. In particular, questions have been raised regarding when and how BPA should make sales to Pacific Northwest customers before sales out of region and BPA's responsibility to insure that adequate power is available in the Pacific Northwest. BPA's standards for reliability of energy service to its Pacific Northwest customers, once nonregional sales of surplus firm power and nonfirm energy were made, have also been a concern. BPA has addressed some of these questions individually as they arose in a particular sale, and now will review our practice.

*Id.*

BPA's notice asked for written comments on the scope of its issues to be returned by April 30, 1990. *Id.* After publication of the notice, however, BPA received requests from customers to hold an informational briefing and to extend the time for written comments some 60 additional days. For these reasons, BPA extended the initial comment deadline to July 30, 1990. 55 Fed.Reg. 17,485 (Apr. 25, 1990). This administrative process within the BPA is still ongoing.

On March 1, 1990, approximately one week after the BPA had initiated its formal notice administrative proceeding designed to evaluate its current extraregional sales of surplus electricity policy, Puget filed suit in this Court seeking damages for breach of contract and for declaratory relief in the future. In its complaint, Puget alleges that BPA breached a number of Puget's contracts because BPA's actions in marketing power outside the Pacific Northwest region were inconsistent with the Northwest Power Act, 16 U.S.C. § 839f(c) and the Regional Preference Act, 16 U.S.C. §§ 837–837h, which are the public laws the clause incorporates into Puget's contracts by reference. Puget contends that:

Commencing in 1982 and continuing through the date of this Complaint, BPA has been marketing electric power outside of the Pacific Northwest in flagrant disregard and breach of the Regional Preference Provisions contained in Puget Power's BPA Contracts as set forth above and thereby has deprived Puget Power of the preference and priority to BPA electric power which it is guaranteed under such contractual Regional Preference Provisions.

Compl. ¶ 9. Puget further contends that BPA has breached Puget's contacts in the following manner:

(a) Failure to guarantee to its Pacific Northwest customers, including Puget Power, first call on its electric power;

(b) Disposition of electric power outside of the Pacific Northwest which was not surplus to the needs of the Pacific Northwest or to the needs of Puget Power as a BPA Pacific Northwest customer;

(c) Disposition of electric power outside of the Pacific Northwest for which there was both a market and a demand in the Pacific Northwest, including a market and demand for such power on Puget Power's electric system as a BPA Pacific Northwest customer;

(d) Refusal to allow Puget Power to purchase or otherwise obtain at established rates BPA electric power which BPA was marketing outside of the Pacific Northwest to others.

(e) Conditioning Puget Power's acquisition of BPA's electric power on payment of the prices for such power which BPA was able to obtain by marketing it outside of the Pacific Northwest; and

(f) Marketing BPA's electric power outside of the Pacific Northwest to others before marketing it first in accordance with the Regional Preference Provisions within the Pacific Northwest to its Pacific Northwest customers, including Puget Power.

Compl. ¶ 10. Therefore, according to Puget, this Court should award it money damages for past breaches of its contracts and award declaratory relief such "that BPA may not in the future sell or exchange power in violation of the Regional Preference Provisions of its contracts with Puget Power * * *." Compl. Prayer for Relief.

Thus, Puget, in its complaint, requests relief: (1) in the amount of 20 million dollars or such other amount as may be proven at trial; (2) for such further damages accruing hereafter until trial; (3) for interest, costs, disbursements and attorneys' fees; (4) declaring that BPA may not in the future sell or exchange power in violation of the Regional Preference Provisions of its contracts with Puget Power; and (5) ordering such other relief as the Court may deem just and proper.

### DISCUSSION

This case is currently before the Court on the Government's motion to dismiss for lack of subject matter jurisdiction. In its motion, the Government contends that despite Puget's characterization of its claim as one for breach of contract, it is in reality a claim challenging the sale of surplus energy by the BPA outside of the Pacific Northwest as being inconsistent and in violation of the preference provisions of two statutes, the Northwest Power Act, 16 U.S.C. §§ 839–839h and the Regional Preference Act, 16 U.S.C. §§ 837–837h. The Government asserts that such a claim implicates the exclusive judicial review provisions of the Northwest Power Act, 16 U.S.C. §§ 839–839h. That Act expressly provides that "sales, exchanges, and purchases of electric power [by the BPA] under section 839c [of the Act]" constitute final actions subject to judicial review and that such review *shall* be filed in the United States Court of Appeals for the region (*i.e.*, Ninth Circuit). 16 U.S.C. § 839f(e)(1) and (5). The Government, therefore, concludes that this precisely drawn and detailed statute expressly provides an exclusive forum for claims challenging final ac-

tions taken by BPA's Administrator pursuant to the Act, or BPA's implementation of such final actions. The statute, therefore, preempts any remedy available to a claimant under a general statutory provision, such as the Tucker Act, 28 U.S.C. § 1491, which is the only basis cited by Puget for this Court to entertain its claims.

In addition to its "exclusive jurisdiction" argument, the Government also believes that the doctrine of primary jurisdiction requires that this Court dismiss the plaintiff's claims for lack of jurisdiction. The Government contends that the BPA had begun administrative proceedings to develop a formal policy governing BPA's extraregional sales of surplus power, prior to the plaintiff's initiation of this suit. The Government asserts that this continuing proceeding will address the same legal issues raised in the plaintiff's complaint. As such, the Government argues that this Court (or any appropriate court) should allow BPA to complete its administrative proceeding prior to judicial review of Puget's claims. Accordingly, the Government concludes that the plaintiff's complaint should be dismissed for lack of jurisdiction under the doctrine of primary jurisdiction.

Finally the Government contends, in the alternative, that Puget's claims for declaratory relief and money damages arising from purported contract breaches occurring more than six years before the filing of the complaint should be dismissed for lack of jurisdiction in any event. This is true, the Government asserts, since this Court clearly does not have authority to issue general declaratory relief orders or to entertain contract claims filed after the expiration of the Court's six-year statute of limitations.[8]

As earlier indicated, the Government prevails on its motion. Because the Court agrees with the Government's "exclusive jurisdiction" argument placing exclusive final action review jurisdiction of the plaintiff's claim in the United States Court of Appeals for the Ninth Circuit, the Court need not determine whether the doctrine of

8. At oral argument, the plaintiff conceded that only those contract breaches that occurred with-

in the six years prior to the filing of its law suit would still be viable. *See* 28 U.S.C. § 2501.

primary jurisdiction would also preclude this Court from assuming jurisdiction in this matter.[9]

█ Like its predecessor, the United States Court of Claims, this is a court of special and therefore limited jurisdiction. *American Maritime Transport, Inc. v. United States,* 870 F.2d 1559, 1563 (Fed. Cir.1989). *Kennedy v. United States,* 19 Cl.Ct. 69, 75 (1989); *Heagy v. United States,* 12 Cl.Ct. 694, 697 (1987), *aff'd mem.,* 848 F.2d 1244 (Fed.Cir.1988); *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 428 (1984), *aff'd mem.,* 758 F.2d 665 (Fed.Cir.1984); *see also Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957). This is not an unusual concept, since even the district and circuit courts of the United States have jurisdiction only over those matters that the Congress has chosen to entrust by legislation to their welfare. Also, absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941).

█ Congressional consent to suit in this Court, thereby waiving the Government's traditional immunity, must be explicit and strictly construed. *Library of Congress v. Shaw,* 478 U.S. 310, 318–19, 106 S.Ct. 2957, 2963–64, 92 L.Ed.2d 250 (1986); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *Fidelity Constr. Co. v. United States,* 700 F.2d 1379, 1383 (Fed.Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983). A waiver of sovereign immunity, therefore, cannot be implied, but must be expressed unequivocally by Congress. *United States v. Testan,* 424 U.S. at 399, 96 S.Ct. at 953; *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969).

The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491. *United States v. Testan,* 424 U.S. at 397, 96 S.Ct. at 954; *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 151, 655 F.2d 1047, 1051 (1981). Under that statute, an action may be maintained in this Court only if it is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.

█ In this case, Puget alleges that:

Commencing in 1982 and continuing through the date of this Complaint, BPA has been marketing electric power outside of the Pacific Northwest in flagrant disregard and breach of the Regional Preference Provisions contained in Puget Power's BPA Contracts as set forth above and thereby has deprived Puget Power of the preference and priority to BPA electric power which it is guaranteed under such contractual Regional Preference Provisions.

Compl. ¶ 9. Puget, thereafter, contends that this Court has jurisdiction to hear its claims because they are founded upon a breach of an express contract with the United States. Puget, however, fails to recognize that, even if one assumes that the claims asserted in its complaint are founded upon a contract with the United States, and thus nominally within the jurisdiction of this Court pursuant to the Tucker Act, this Court lacks jurisdiction to entertain those claims because Congress has expressly placed jurisdiction over those claims in another forum under the Northwest Power Act.

█ In a variety of contexts, the United States Supreme Court has held that a remedy furnished by a precisely drawn and detailed statute preempts a more general

**9.** Although unnecessary to decide, the Government is also correct that this Court does not have general declaratory judgment jurisdiction in the contract subject matter area. *See United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23

L.Ed.2d 52 (1969); *Overall Roofing & Constr., Inc. v. United States,* 929 F.2d 687 (Fed.Cir. 1991); *see also* 28 U.S.C. § 1491(a)(3) and legislative history.

remedy provided by statute. *Brown v. GSA*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976); *Stonite Prod. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 566–67, 62 S.Ct. 780, 782–83, 86 L.Ed. 1026 (1942). For example, in *United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966), the Court expressly held that a prison inmate, who was injured during prison employment and, therefore, eligible for compensation under a statute authorizing Federal Prison Industries to pay compensation to inmates for injuries suffered on the job, 18 U.S.C. § 4126, was precluded from suing for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671. The Court explained that, because the "Government has created a comprehensive system to award payments for injuries, it should not be held to have made exceptions to that system without specific legislation to that effect." *United States v. Demko*, 385 U.S. at 151, 87 S.Ct. at 384, *quoting Johansen v. United States*, 343 U.S. 427, 441, 72 S.Ct. 849, 857, 96 L.Ed. 1051 (1952). Further, in *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Court expressly held that state prisoners may not seek redress under the Civil Rights Act, 42 U.S.C. § 1983, even though their complaints come within the literal terms of that statute because the federal habeas corpus statute, 28 U.S.C. § 2254 clearly provides a specific federal remedy. The Court stated that, in amending the habeas corpus laws, Congress clearly required exhaustion of state remedies as a condition precedent to invocation of federal judicial relief, and it would wholly frustrate explicit congressional intent to hold that claimants could evade this requirement by the simple expedient of putting a different label on their pleadings. *Preiser* at 489, 93 S.Ct. at 1836.

■ The rule that a remedy furnished by a precisely drawn, detailed statute preempts a more general statutory remedy is especially applicable to the general remedy provided by the Tucker Act, because the legal doctrine that consent to suit against the sovereign must be strictly construed overrides the doctrine that repeals by implication are not favored. *E.g., Harris v. United States*, 841 F.2d 1097, 1100–01 (Fed.Cir.1988); *John Muir Memorial Hosp., Inc. v. United States*, 221 Ct.Cl. 843, 846 (1979). As the United States Court of Appeals for the Federal Circuit recently explained in *Harris*, 841 F.2d at 1100, *citing Testan*, 424 U.S. at 398–99, 96 S.Ct. 948, the Supreme Court has long adhered to the classic jurisdictional doctrine— (a) that the United States, as sovereign, cannot be sued without its own express consent granted by Congress, (b) that such consent "cannot be implied but must be unequivocally expressed," and (c) that there must be not only consent to suit in the tribunal that is to exercise jurisdiction, but also to the substantive liability for which money is sought. Thus, repeal of a preexisting Tucker Act remedy by implication, *i.e.*, a statute providing a more specific remedy, "is highly respectable and not a novelty" because the unequivocal expression for consent to suit against the sovereign means "something more than just expressed." *Harris*, 841 F.2d at 1101.

One need only examine several classic Supreme Court decisions to see that "[t]he instances of partial repeal of the Tucker Act by laws expressly directing litigation of some class or kind elsewhere are common." *Fiorentino v. United States*, 221 Ct.Cl. 545, 555, 607 F.2d 963, 969 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980). For example, over 50 years ago, the Supreme Court held in *Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932), that enactment of the Suits in Admiralty Act of 1920, 41 Stat. 525–28, which consented to suits against the United States upon admiralty claims in district courts, withdrew by implication that portion of the Tucker Act which consented to admiralty suits against the United States, even though such suits frequently had been entertained by the Court of Claims. More recently, the Supreme Court held in *Brown* that previously debatable judicial remedies against the United States for racial discrimination in employment, including the Tucker Act, were all repealed by implication when Congress enacted the

Equal Employment Act of 1972, 86 Stat. 103. The Court stated that "[t]he legislative history thus leaves little doubt that Congress was persuaded that federal employees who were treated discriminatorily had no effective judicial remedy" and this "unambiguous congressional perception seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown*, 425 U.S. at 828–29, 96 S.Ct. at 1965–66. The Court added that "[t]he balance, completeness, and structural integrity of the [newly enacted statutory provision] are inconsistent with the petitioner's contention that the judicial remedy afforded by [the new statute] was designed merely to supplement other putative judicial relief." *Brown*, 425 U.S. at 832, 96 S.Ct. at 1967.

This Court's predecessor, the United States Court of Claims, has repeatedly adhered to the principle enunciated by the Supreme Court—that a statute expressly directing that claims be pursued in another forum implicitly repealed any previously available consent to suit under the Tucker Act. For example, in *John Muir Memorial Hosp., Inc.*, 221 Ct.Cl. at 845–46; *Alabama Hosp. Ass'n v. United States*, 228 Ct.Cl. 176, 185, 656 F.2d 606, 611–12 (1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *Appalachian Regional Hosp., Inc. v. United States*, 217 Ct.Cl. 1, 7–9, 576 F.2d 858, 861–62 (1978); and *Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 58, 536 F.2d 347, 351 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), the Court of Claims expressly held that the Tucker Act confers jurisdiction upon the court to resolve claims for Medicare reimbursement only in the absence of specific legislation providing that review be available exclusively elsewhere. Further, in *Fiorentino*, 221 Ct.Cl. at 555, 607 F.2d at 969–70, the Court of Claims expressly held that "[i]f the consent to be sued here ever included the back pay claim of one having no property interest in his job, and legally aggrieved solely because of derogatory material in government files generated by his firing, we think

that consent is withdrawn by the Privacy Act of 1974, 5 U.S.C. § 552a," which "provides an administrative remedy for one so aggrieved, and if he is unsuccessful with that, he can sue in the U.S. District Court, including a suit for correction of his record." In explaining its decision, the court reiterated the principle that "the rule of strict construction of the consent to be sued overrides the rule that repeals by implication are disfavored." *Fiorentino*, 221 Ct.Cl. at 556, 607 F.2d at 969–70.

The United States Court of Appeals for the Federal Circuit recently reaffirmed the validity of *Fiorentino* and other similar precedent. In *Harris*, 841 F.2d at 1100–01, the court of appeals held that the more specific provisions of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, effected a repeal by implication of the provisions of the Tucker Act, so far as the Tucker Act consented to suit for environmental differential pay to a prevailing wage employee without regard to available remedies such as arbitration. The court stated that the Supreme Court's recent opinion in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), "teaches that in effectuating the intent of Congress to replace one remedy with another, the doctrine that repeals by implication are not favored cannot be allowed to overcome other and plainer indications of intent." *Harris*, 841 F.2d at 1100.

Similarly, in *McClary v. United States*, 775 F.2d 280 (Fed.Cir.1985), the court held that the Civil Service Reform Act of 1978, 5 U.S.C. § 7512, effected a repeal by implication of the provisions of the Tucker Act so far as the Tucker Act consented to suit for a back pay claim based upon an improper demotion. The court explained that, under the Civil Service Reform Act, Congress had expressly provided another means of redress for such claims, *i.e.*, an appeal to the Merit Systems Protection Board. *Id.* at 282; *accord Carter v. Kurzejeski*, 706 F.2d 835, 839–40 (8th Cir.1983).

■ Accordingly, even if a claim asserted in a complaint is assumed to be one founded upon a contract or a legal provision, which can be construed fairly as man-

dating the payment of monies sought, and thus nominally within the jurisdiction of this Court pursuant to the Tucker Act, it is well established that this Court will lack jurisdiction to entertain that claim if Congress has expressly placed jurisdiction over that claim elsewhere. *E.g., Matson Navigation Co.*, 284 U.S. at 356, 359, 52 S.Ct. at 164, 165; *Fox v. United States*, 229 Ct.Cl. 478, 479 (1981); *Freese v. United States*, 221 Ct.Cl. 963, 965 (1979); *Fiorentino*, 221 Ct.Cl. at 555, 607 F.2d at 969–70; *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 606, 372 F.2d 1002, 1008 (1967); *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 167 Ct.Cl. 236, 244, 334 F.2d 622, 626 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965); *Amerikohl Mining, Inc. v. United States*, 16 Cl.Ct. 623, 624–27 (1989), *aff'd* 899 F.2d 1210 (Fed.Cir.1990). As the Court of Claims explained in *John Muir Memorial Hosp., Inc.*, 221 Ct.Cl. at 846, where Congress wishes to preserve jurisdiction in this Court when subsequently providing a remedy for claims elsewhere, it is careful to expressly state that this Court's jurisdiction survives, as in 28 U.S.C. § 1346(a) (tax refund claims). A statute directing that a claim be pursued elsewhere, therefore, must be interpreted as withdrawing consent to suit in this Court. *John Muir Memorial Hosp., Inc.*, 221 Ct.Cl. at 846; *accord Harris*, 841 F.2d at 1100–01; *McClary*, 775 F.2d at 282; *Skirlick v. United States*, 17 Cl.Ct. 735, 741 (1989), *aff'd mem.*, 904 F.2d 45 (Fed.Cir.1990).

On March 1, 1990, Puget filed its complaint with this Court alleging that BPA had breached its contracts with Puget by marketing electric power outside the Pacific Northwest in a manner inconsistent with the Regional Preference Act, 16 U.S.C. §§ 837–837h, and section 9(c) of the Northwest Power Act, 16 U.S.C. § 839f(c). Puget rests its claim on generic contract provisions appended to all BPA power sales contracts which incorporate those two Acts by reference. As the defendant has contended, however, the true nature of Puget's claim is a challenge to BPA's extraregional power sales under the Northwest Power Act as not complying with that Act and the Regional Preference Act.

Puget cites a number of its contracts with BPA that incorporate the above-noted Acts by reference. It alleges that BPA has breached its contracts with Puget by marketing electric power outside of the region in a manner inconsistent with the generic contract provisions. However, these contract provisions simply incorporate the statutory provisions of the Regional Preference Act and sections 9(c) and 9(d) of the Northwest Power Act. Accordingly, these sections simply provide that BPA will act in compliance with the terms of the statutes. The issues identified in Puget's complaint, therefore, are solely statutory, premised on statutory language, not contract language. *See generally Honeywell, Inc. v. United States*, 228 Ct.Cl. 591, 596, 661 F.2d 182, 186 (1981).

While Puget raises a number of claims in its complaint, each of Puget's claims is an alleged statutory violation. *See* 16 U.S.C. §§ 837a, 837b, 837c, 837d; 16 U.S.C. § 839f(c). Under the Northwest Power Act, BPA's extraregional power sales and implementation of those power sales pursuant to section 5(f) of the Act are final actions of the Administration of the BPA that must comply with the requirements of section 9(c) of that Act, 16 U.S.C. § 839f(c), and the Regional Preference Act, 16 U.S.C. §§ 837–837h. If BPA sells power outside the region in a manner consistent with the Acts, the sales are "lawful," *i.e.*, in accordance with the statutes. If BPA sells power outside the region in a manner inconsistent with the Acts, the sales are "not lawful," *i.e.*, a violation of the statutes. Thus, it is clear that the *source* of Puget's claim is the consistency of BPA's power sales outside the region with the "governing statutes."

In passing the Northwest Power Act, Congress expressly directed that the United States Court of Appeals for the Ninth Circuit has exclusive jurisdiction to review the lawfulness of BPA's power sales. Section 9(e)(5) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5), a comprehensive and detailed statute governing virtually all

functions performed by BPA, provides that the Ninth Circuit has exclusive jurisdiction to review BPA's actions under the Northwest Power Act and the Regional Preference Act. It states that:

> Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this Act, the Bonneville Project Act [16 U.S.C. § 832 *et seq.*], the Act of August 31, 1964 (16 U.S.C. 837–837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region.

16 U.S.C. § 839f(e)(5).

Section 9(e)(1) of the Northwest Power Act, 16 U.S.C. § 839f(e)(1), provides a non-exclusive list of final actions subject to the Ninth Circuit's exclusive jurisdiction, including power sales. Section 9(e)(1) states that:

> For purposes of section 701 through 706 of title 5, the following actions shall be final actions subject to judicial review—
>
> \*     \*     \*     \*     \*     \*
>
> (B) sales, exchanges, and purchases of electric power under section 839c \* \* \*.

Here, as discussed above, the action Puget challenges is the *sale* of surplus electric power outside the Pacific Northwest. Sales of surplus power are an action authorized under section 5(f) of the Northwest Power Act, 16 U.S.C. § 839c(f). Section 5(f) provides that:

> The Administrator is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to his obligations incurred pursuant to subsections (b), (c), and (d) of this section in accordance with this and other Acts applicable to the Administrator, including the Bonneville Project Act of 1937 (16

U.S.C. 832 and following), the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), and the Act of August 31, 1964 (16 U.S.C. 837–837h).

In addition, extraregional sales of power are an action of the Administrator under section 9(c) of the Northwest Power Act, 16 U.S.C. § 839f(c).

To the extent Puget is resting its claim upon the Regional Preference Act, Puget's claim also clearly comes within the Northwest Power Act provisions for judicial review. Section 9(e)(5) of the Northwest Power Act expressly places judicial review of final actions and decisions brought pursuant to the Regional Preference Act within the exclusive jurisdiction of the Ninth Circuit. As noted above, section 9(e)(5) provides that suits to challenge "final actions and decisions taken pursuant to this chapter [see sections 5(f) and 9(c) ] by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, \* \* \* [or] the Act of August 31, 1964 (16 U.S.C. 837–837h) [Regional Preference Act] \* \* \* shall be filed in the United States court of appeals for the region [*i.e.*, Ninth Circuit]." 16 U.S.C. § 839f(e)(5). Thus, Congress expressly intended that challenges to agency actions such as surplus power sales under the Regional Preference Act would be within the exclusive jurisdiction of the Ninth Circuit.[10] *Id.; see also* 16 U.S.C. § 839c(f).

■ The central issue of this motion is, therefore, whether the plaintiff's claim for breach of contract, is, in effect, a challenge to a *final action* of the Administrator of the BPA, *i.e.*, the sale of surplus electric power out of the region (or implementation thereof) which removes the claim from the jurisdiction of this Court.

The Ninth Circuit repeatedly has held that its jurisdiction to review BPA's final actions under the Northwest Power Act is exclusive. *Pub. Util. Comm'r v. BPA*, 767 F.2d 622, 627 (9th Cir.1985); *Pacific Power*

---

**10.** If Congress specifically designates a forum for judicial review of administrative action, that forum is exclusive regardless of whether the statute uses the word "exclusive." *UMC Indus.,*

*Inc. v. Seaborg,* 439 F.2d 953, 955 (9th Cir.1971); *Amerikohl Mining, Inc. v. United States,* 16 Cl.Ct. at 624–27, *aff'd* 899 F.2d 1210 (Fed.Cir.1990).

& *Light Co. v. BPA,* 795 F.2d 810, 814 (9th Cir.1986); *Central Lincoln PUD v. Johnson,* 735 F.2d at 1109; *Central Montana Elec. Power Coop., Inc. v. Adm'r BPA,* 840 F.2d 1472, 1476 (9th Cir.1988). In addition, the court consistently has held that it is the nature of the conduct challenged which determines the exclusive jurisdiction of the court—where the conduct challenged is a final action taken pursuant to the Northwest Power Act, the Ninth Circuit has exclusive jurisdiction. *Pacific Power & Light Co. v. BPA,* 795 F.2d at 814; *CP Nat'l Corp. v. Jura,* 876 F.2d 745, 747–48 (9th Cir.1989); *Pub. Util. Dist. No. 1 of Clark County v. Johnson,* 855 F.2d 647, 649 (9th Cir.1988) (hereinafter *Clark County* ).

In the instant case, the conduct challenged is the sale of BPA's surplus power outside the Pacific Northwest pursuant to section 5(f) of the Northwest Power Act. 16 U.S.C. § 839c(f); Compl. ¶ 9. BPA's power sales, including sales of surplus power, are final actions subject to the Ninth Circuit's exclusive jurisdiction. 16 U.S.C. §§ 839f(e)(1)(B), (e)(5).

In *Pacific Power & Light Co. v. BPA,* 589 F.Supp. 539 (D.Or.1984), plaintiffs brought suit in the federal district court for declaratory relief from BPA's adoption of a new average cost methodology as a breach of its contractual obligation to the plaintiffs, based upon the Northwest Power Act. The district court judge dismissed the case for lack of subject matter jurisdiction, concluding that "[a]lthough plaintiff's seek to characterize their remaining claim as a pure contract issue unentangled with the merits or procedure of BPA's rate proceeding, my exercise of jurisdiction would necessarily impact the course of the * * * rate case." *Id.* at 545.

On appeal, the Ninth Circuit affirmed the district court. *Pacific Power & Light Co. v. BPA,* 795 F.2d 810 (9th Cir.1986). The appeals court based its decision pertaining to its jurisdiction not upon the legal theory advanced by plaintiff but rather the agency function:

> In § 839f(e)(5), [the judicial review provision for the sale of electric power] Con-

gress has decided that jurisdiction under the Act should be a function of the agency whose actions are being challenged rather that an function of the cause of action which petitioner asserts. This jurisdictional scheme is consistent with myriad statutes which confer original jurisdiction on courts of appeals based upon the agency being attacked. *See e.g.,* 28 U.S.C. § 2321 (actions by the Interstate Commerce Commission); 28 U.S.C. § 2342 (actions by several independent federal commissions); 29 U.S.C. § 160 (orders of the National Labor Relations Board); 15 U.S.C. § 717r (Federal Energy Regulatory Commission orders under the Natural Gas Act) * * *. For jurisdictional purposes, therefore, it matters not whether the utilities' suit is grounded in contract, administrative law, or some other legal theory. Instead, jurisdiction arises because the actions of a particular agency are being challenged and because of the nature of the agency action at issue. The proper inquiry focuses on the agency being attacked and whether the factual basis for that attack is an agency action authorized by the Act.

*Id.* at 816.

In *Central Montana Elec. Power Coop., Inc. v. Adm'r BPA,* 840 F.2d 1472 (9th Cir.1988), public utility customers of BPA in Montana asserted that they were entitled to a geographic preference in power generated by the Libby hydroelectric project. The customers alleged that power generated at Libby was to be marketed first in Montana. In determining jurisdiction, the court stated that:

> The nature of the agency action being challenged by the Cooperatives is the Administrator's final action as to the marketing and allocation of electric power, a function that is governed extensively by the Northwest Power Planning Act. The Cooperatives maintain that they do not challenge a final determination "under" the Northwest Power Planning act. However, the effect of their action is to challenge the BPA's power-marketing decision * * *. Accordingly, the action is subject to our exclusive jurisdiction under 16 U.S.C. § 839f(e)(5).

*Central Montana*, 840 F.2d at 1476. The court held that "[b]ecause we find that the Administrator's power allocation decision was a 'final action and decision taken pursuant to [the Northwest Power Planning] Act,' 16 U.S.C. § 839f(e)(5), original jurisdiction over the Cooperatives' challenge to the Administrator's decision lies exclusively with this Court." *Central Montana*, 840 F.2d at 1476.

In the instant case, Puget is also challenging the Administrator's "marketing and allocation of electric power" and claiming a geographic preference right to power. Puget's challenge to the Administrator's power marketing decision is founded expressly upon the Northwest Power Act and the Regional Preference Act. Puget's claim, therefore, is subject to the exclusive jurisdiction of the Ninth Circuit under 16 U.S.C. § 839f(e)(5).

This principle has been repeatedly followed. In *CP Nat'l Corp. v. Jura*, 876 F.2d 745, 747 (9th Cir.1989), the court held that:

> A party's characterization of its claim as one for breach of contract is not dispositive of jurisdictional issues. In *Pacific Power and Light Co. v. Bonneville Power Administration*, 795 F.2d 810, 816 (9th Cir.1986), we stated that in enacting section 839f(e)(5), Congress has decided that jurisdiction under the Act should be a "function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts."

Similarly, in *Central Elec. Coop. v. BPA*, 835 F.2d 199 (9th Cir.1987), a utility customer of BPA claimed that BPA's refusal to acknowledge a rate increase which would have given the petitioner increased subsidy benefits constituted a breach of contract. The court stated that "[w]hile CEC urges us to declare that contract law governs this suit, * * *. BPA views its action as a regulatory decision rather than a breach of contract." *Id.* at 203. The court then rejected the breach of contract

characterization, finding that the Ninth Circuit has exclusive jurisdiction to review "sales, exchanges, and purchases of electric power" under section 5 of the Northwest Power Act. *Id.* at 204.[11]

■ An evaluation of congressional intent reveals at least two compelling reasons why Congress decided in the Northwest Power Act to place judicial review of challenges to the sale of BPA power exclusively in the Ninth Circuit. First, Congress desired to avoid conflicting judicial interpretations among federal courts. *Forelaws on Bd. v. Johnson*, 709 F.2d 1310, 1313 (9th Cir.1983) (the bifurcation of court review could result in the same agency decision being reviewed simultaneously at two different levels); *Pacific Power & Light Co. v. BPA*, 795 F.2d at 815 ("[o]riginal jurisdiction in [the court of appeals] permits uniform interpretation of the Act and promotes expedited review"). *See also Clark County*, 855 F.2d at 650. Although the above cases concern jurisdictional questions between the region's district courts and the court of appeals, the reasoning is equally applicable to the case at bar. If this Court were to decide Puget's claim on the merits, such a decision would necessarily concern agency action authorized under the Act and such questions are expressly reserved for review by the court of appeals. Thus, a decision by this Court would circumvent the congressional intent for uniform interpretation of the Act.

The second compelling reason why the Ninth Circuit is given exclusive judicial review is to ensure a speedy resolution of the issue. The congressional purpose of the Act was to respond to the urgent need to allocate power in the Pacific Northwest. *See Pub. Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir.1982); *Forelaws on Bd. v. Johnson*, 709 F.2d at 1312–13; *Central Montana Elec. Coop., Inc. v. Adm'r BPA*, 840 F.2d at 1476. As the district court noted in *Nat'l Wildlife Fed'n v. Johnson*, 548 F.Supp. 708, 709–10 (D.Or.

---

**11.** Ordinarily, of course, district courts and the regional courts of appeals cannot entertain "contract actions" against the United States, except pursuant to the Little Tucker Act, 28 U.S.C.

§ 1346. *E.g., North Side Lumber Co. v. Block*, 753 F.2d 1482 (9th Cir.), *cert. denied*, 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985).

1982) *aff'd sub nom. Forelaws on Bd. v. Johnson,* 709 F.2d 1310 (9th Cir.1983),

It was the intent of Congress to expedite the litigation they knew would follow passage of and actions under this act. If the suit, in fact, challenges 'final actions' it should be expedited as directed by Congress. [Footnote omitted.]

By eliminating the involvement of one level of the federal judiciary (the trial level) and designating a single tribunal to hear disputes, Congress intended to promote the quick and efficient resolution of conflicts arising under the Act. This is no doubt the reason why the statute reads that any challenges to final actions have to be brought to the Ninth Circuit within 90 days. Were this Court to exercise jurisdiction over the merits, congressional intent would be circumvented in two ways: (1) by allowing a delay of up to six years (under the Tucker Act), and (2) by allowing review by a federal appellate court other than the Ninth Circuit.

While challenges to final actions under the Northwest Power Act, such as power sales, are subject to the Ninth Circuit's exclusive jurisdiction, BPA's *implementation* of those final actions is also subject to the Ninth Circuit's exclusive jurisdiction. The Ninth Circuit has exclusive jurisdiction to review challenges to the *implementation* of final actions under the Northwest Power Act and the Regional Preference Act. 16 U.S.C. § 839f(e)(5).

Here, Puget alleges that BPA's extraregional power sales are unlawful. However, such sales are administrative allocations of power administered through contracts. Thus, in challenging BPA's extraregional power sales, Puget essentially challenges BPA's administrative allocation of federal power and the implementation of the extraregional sales contracts.

Preference, as discussed below, is a right granted by statute to certain entities. It requires that a federal agency give priority to specified entities when it administratively allocates federal power sold under contracts if there is a competing application by preference agencies for unallocated federal power. A statutory right to preference and priority merely determines who has the first opportunity to purchase federal power which is available and not previously allocated by contract. A claim to preference and priority in the sale of federal power thus is an administrative claim over the manner in which the federal agency has interpreted and implemented applicable federal statutes granting the purchaser a right to priority in purchasing available federal power.

The Ninth Circuit consistently has addressed regional preference issues. *Pacificorp v. BPA,* 856 F.2d 94 (9th Cir.1988); *Aluminum Co. of America v. BPA,* 891 F.2d 748, *modified,* 903 F.2d 585 (9th Cir. 1989), *cert. denied sub nom., California Public Utilities Comm'n v. FERC,* —— U.S. ——, 111 S.Ct. 672, 112 L.Ed.2d 665 (1991); *California Energy Resources Conservation & Dev. Comm'n v. BPA,* 831 F.2d 1467 (9th Cir.1987), *cert. denied,* 488 U.S. 818, 109 S.Ct. 58, 102 L.Ed.2d 36 (1988); *California Energy Resources Conservation & Dev. Comm'n v. Johnson,* 783 F.2d 858, *modified,* 807 F.2d 1456 (9th Cir. 1986); *Central Montana Elec. Coop., Inc. v. Adm'r of BPA,* 840 F.2d at 1472; *Dept. of Water & Power v. BPA,* 759 F.2d 684 (9th Cir.1985). The Ninth Circuit is the court designated by Congress to review such issues. 16 U.S.C. § 839f(e)(5).

The United States Supreme Court has specifically characterized a claim of preference as one involving a statutory right to an administrative allocation of federal power through power sales contracts. In *ALCOA v. Central Lincoln PUD,* 467 U.S. at 393, 104 S.Ct. at 2482, BPA's preference customers challenged the allocation of nonfirm energy for service to the DSI top quartile loads under the Northwest Power Act contracts on the grounds that previously BPA had sold nonfirm energy to preference customers first. In discussing whether BPA had violated section 5(a) of the Bonneville Project Act, 16 U.S.C. § 832d(a), and section 5(a) of the Northwest Power Act, 16 U.S.C. § 839c(a), by providing nonfirm energy to its DSI customers under new contracts, the Supreme Court ad-

dressed the meaning of preference and priority. The Court stated that:

> It is true, as respondents assert, that that section preserves the priority and preference provisions that existed under the Project Act. But the preference system merely determines the priority of different customers when the Administrator receives "conflicting or competing" applications for *power that the Administrator is authorized to allocate administratively.*

*ALCOA v. Central Lincoln PUD,* 467 U.S. at 393, 104 S.Ct. at 2481 (emphasis added). The Court held that the contracts did not violate preference principles because there was a congressional allocation of power. The Court further explained that preference continues to be a factor in administrative power allocations:

> As was the case prior to the Regional Act, preference continues to govern *the allocation of all power that is not committed by contract.* Thus, the preference rules will apply to any subsequent contracts made with DSIs. Even during the period of the initial contracts, the *preference provisions apply to any surplus power that exists. See 16 U.S.C. § 839c(f).* Such surplus might exist for example, because of especially high annual or seasonal streamflow fluctuations, or because BPA's power acquisition program secures additional power faster than BPA's increasing contractual commitments.

*ALCOA v. Central Lincoln PUD,* 467 U.S. at 395 n. 10, 104 S.Ct. at 2482 n. 10 (citation omitted, emphasis added). BPA simply is required to give preference to public bodies' "applications for power when competing applications from nonpreference customers are received." *ALCOA v. Central Lincoln PUD,* 467 U.S. at 384, 104 S.Ct. at 2476. Thus, preference is a statutory right which governs the administrative allocation of federal power which has not already been committed by contract. The right of preference is essentially a right of first refusal on the power to be sold, but only if a competing request is made.

Courts reviewing preference claims made by other purchasers against other federal power marketing agencies have similarly interpreted preference provisions. In *Arizona Power Auth. v. Morton,* 549 F.2d 1231 (9th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977), the court reviewed claims to preference under section 9 of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c), finding that the provision "defines a class of 'preference' customers who shall have the first opportunity to purchase hydroelectric power generated by federal reclamation projects." *Arizona Power,* 549 F.2d at 1237 (emphasis added); *accord Santa Clara v. Andrus,* 572 F.2d 660, 667 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).

Moreover, challenges to the allocation of power from federal projects by other federal power marketing agencies have been previously reviewed by courts as administrative claims under the APA, 5 U.S.C. §§ 701–705. In *Arizona Power,* the court stated that the issue was whether the exercise of the Secretary of Interior's authority under the Colorado River Storage Project Act to contract for the sale of federal power was judicially reviewable under the APA.

As discussed above, an analysis of the statutory provisions cited by Puget demonstrates that any right to preference Puget may have is in no way expanded or diminished under the statutory provisions incorporated into its contracts. Rather, BPA was directed by statute to include the provisions in all its contracts. The Regional Preference Act states in pertinent part that "[t]he Secretary * * * shall include in all new contracts, provisions giving the purchaser priority on electric power generated at [federal hydroelectric] plants in conformity with the provisions of this chapter." 16 U.S.C. § 837f. Thus, the contract provisions do nothing more than restate a statutory right as required by Congress.

BPA implements its administrative allocations of federal power by making sales to purchasers under contracts. Puget is not the only purchaser with whom BPA con-

tracts for the sale of power. All BPA sales are made under written contracts with the exception that daily, weekly or other short-term nonfirm power sales are made under umbrella agreements and memoranda for such sales. 16 U.S.C. § 832d(a); 16 U.S.C. §§ 839c(b), (d), (f). The implementation of BPA's administrative allocations through contracts is contemplated by and consistent with the provisions of section 2 of the Regional Preference Act, which requires BPA to give notice to its existing customers that negotiations for a contract for the sale of surplus power are pending and, at the customer's request, to make available current drafts of contracts for inspection. 16 U.S.C. § 837a. BPA's contracts for the sale of surplus power under section 5(f) and its sales of surplus power are final actions of the Administrator of BPA or are implementations of a final action, that is, the Administrator's administrative allocations of federal power to purchasers. *See ALCOA v. Central Lincoln PUD*, 467 U.S. at 393, 104 S.Ct. at 2481. The precise issue of whether and how BPA must afford Puget and other Pacific Northwest utilities priority in the purchase of federal power, before it contracts with other parties for the sale of surplus power outside the Pacific Northwest, is exclusively an issue of BPA's interpretation and administration of its statutes governing its administrative allocations of federal power through such sales.

In its opposition to the Government's motion to dismiss, Puget has attempted to circumvent the Northwest Power Act provisions establishing exclusive jurisdiction of the Ninth Circuit to review challenges to BPA's power sales by contending that it is asserting a breach of contract claim, and that the Ninth Circuit has ruled that it lacks jurisdiction to review breach of contract claims for money damages. As support for this contention, Puget relies almost totally upon *Pub. Util. Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647 (9th Cir.1988). Puget, however, misreads the *Clark County* case.

*Clark County* affirms that the Ninth Circuit has exclusive jurisdiction to review challenges to the lawfulness of final actions taken by BPA pursuant to the Northwest Power Act, even where, as here, a plaintiff characterizes its claim as a breach of contract. In that case, petitioner, the Clark County PUD, a publicly-owned utility customer of BPA, filed suit in the Ninth Circuit alleging that the BPA improperly failed to purchase a resource (electricity) from the PUD. The PUD raised a number of claims before the court, including: (1) that BPA breached an oral or implied-in-fact contract; (2) that BPA negligently (*i.e.*, tortiously) failed to perform a duty imposed on it by the Northwest Power Act to execute its oral or implied-in-fact contract with the PUD; and (3) that BPA's decision not to acquire the resource was an arbitrary and capricious agency action violating the mandate of the Northwest Power Act to acquire cost effective resources. *Id.* at 648. The court analyzed its jurisdiction to review these claims, and concluded that the Ninth Circuit had jurisdiction to review any challenges to final agency action but that the Claims Court had exclusive jurisdiction to review the alleged breach of an oral or implied-in-fact contract for money damages exceeding $10,000.

In so concluding, the court distinguished between its exclusive jurisdiction over challenges to final agency action under the Northwest Power Act and the Claims Court's jurisdiction to review breach of contract claims against the United States in excess of $10,000. 855 F.2d at 650. The court explained that one must "determine jurisdiction by looking to the nature of the conduct challenged rather than the label given the cause of action." *Id.* at 649. The relevant issue, therefore, is whether the claimant's action is based upon a final action under the Northwest Power Act, not whether the claimant has simply characterized its claim as one for breach of contract and for money damages, as Puget asserts. *E.g., id.*

In *Clark County*, the court determined that it lacked jurisdiction to entertain the breach of contract claim in that case because "the principal conduct of the agency on which petitioner's claim is based is not final action taken pursuant to statutory

authority; it is alleged contractual commitments made outside the scope of any administrative record, and which petitioners contend have been breached." *Id.* at 650. This determination distinguishes *Clark County* from the case at bar. Here, Puget's claim is directly based upon a final action taken pursuant to statutory authority. As discussed above, Puget asserts in its complaint that BPA's sales of power outside of the Pacific Northwest violate the Regional Preference Act and section 9(c) of the Northwest Power Act, 16 U.S.C. §§ 837–837h; 16 U.S.C. § 839f(c).

Such claims founded upon final actions under the Act are within the exclusive jurisdiction of the Ninth Circuit. 16 U.S.C. §§ 839c(f), 839f(e)(1)(B), (G), (e)(5). Indeed, the *Clark County* court expressly reaffirmed that the court had properly exercised its exclusive jurisdiction in previously reviewing a number of alleged "breach of contract" actions that actually challenged final BPA actions under the Northwest Power Act. 855 F.2d at 649–50, *citing Pacific Power & Light Co. v. BPA,* 795 F.2d 810 (9th Cir.1986); *Atlantic Richfield Co. v. BPA,* 818 F.2d 701 (9th Cir.1987); *Pacificorp v. FERC,* 795 F.2d 816 (9th Cir. 1986); and *Seattle, City Light Dept. v. Johnson,* 813 F.2d 1364 (9th Cir.1987).

In *CP Nat'l,* 876 F.2d 745, decided by the Ninth Circuit subsequent to the *Clark County* case, the court examined its jurisdictional analysis in *Clark County* and again reaffirmed that it had properly exercised its jurisdiction in reviewing alleged "breach of contract" actions that actually challenged final BPA actions under the Northwest Power Act. In *CP Nat'l,* investor-owned and publicly-owned utility customers of BPA, including Puget, alleged that BPA's inclusion of an availability charge in their rates constituted a breach of their power sales contracts with BPA. The Ninth Circuit, however, stated as follows:

Petitioners argue that this court's decision in *Public Utility Dist. No. 1 of Clark County v. Johnson,* 855 F.2d 647 (9th Cir.1988), signifies that the U.S. Claims Court is the exclusive forum for their claims, because petitioners now choose to characterize their claims as sounding in contract. They assert that the availability charges included in the 1983 rates constitute a "breach" of petitioners' power sales contracts with BPA.

Despite the words used to characterize petitioners' grievance, however, its focus is on the 1983 rates. Neither the Pacific Northwest Power Act nor any of our decisions interpreting it support petitioners' argument that the Claims Court has jurisdiction over an action which calls for review of ratemaking by the BPA.

*Id.* at 747 (emphasis added). The court then expressly stated that its "recent decision in [*Clark County*], upon which petitioners rely, is not to the contrary," but "lends support to our exercise of jurisdiction here." *Id.* at 747. The court explained that, in *Clark County,* the petitioner did not challenge a final action under the Act, "but BPA's refusal to purchase one of the utility's power resources," *Id.* at 748. Th ecourt, therefore, specifically reaffirmed the distinction between *Clark County* and the long line of cases cited above that, where the source of a claim is a challenge to final agency action under the Northwest Power Act, even though characterized as breach of contract, the action must be filed in the Ninth Circuit.

The Ninth Circuit's logic in *CP Nat'l* applies directly to this case. Ratemaking is only one of a number of expressly listed agency actions subject to exclusive judicial review in the Ninth Circuit. *See* 16 U.S.C. § 839f(e)(1). As discussed above, section 9(e)(1)(B) of the Northwest Power Act expressly provides that BPA's power sales under section 5 of the Act, including extraregional surplus sales pursuant to section 5(f), are final agency actions under the Act. 16 U.S.C. § 839f(e)(1). Puget's complaint here is based upon BPA's extraregional power sales and/or the implementation of those final actions. Thus, as in *CP Nat'l,* no matter how the action is characterized, the Ninth Circuit has exclusive jurisdiction to entertain what is in reality a challenge by Puget to a final action of BPA taken pursuant to statutory authority under the Northwest Power Act. *Clark County* and *CP Nat'l* simply affirm the Ninth Circuit's consistent holdings that where a party challenges a final action

under the Northwest Power Act, the Ninth Circuit has exclusive jurisdiction to review such a claim, even though the claim is characterized as a breach of contract. Here, Puget argues that BPA's extraregional power sales are inconsistent with the Regional Preference Act and the Northwest Power Act and are, therefore, inconsistent with the contract. Thus, Puget's claim is a challenge to the lawfulness of agency action under the Northwest Power Act reviewable only in the Ninth Circuit.

In summary, the nature of the conduct challenged here is that of a final agency action. Any inquiry into the merits of this challenge will require a review of agency administrative actions involving the extraregional sales of power and the implementation procedures associated with these sales. The language of the Northwest Power Act, the intent of Congress in passing it, and the long and consistent line of cases interpreting that Act, lead to the conclusion that this Court lacks jurisdiction to hear and decide the merits of this case. Challenges to final actions, or implementations of final actions, taken by the BPA are to be exclusively reviewed by the United States Court of Appeals for the Ninth Circuit as specified in section 9(e) of the Northwest Power Act, 16 U.S.C. § 839f(e)(5). Since the Court finds that there is a want of jurisdiction over the plaintiff's action and believes that it would be in the interest of justice to do so, this case will be transferred to the Ninth Circuit pursuant to the authority contained in 28 U.S.C. § 1631.

### CONCLUSION

For the reasons discussed above, the Government's motion to dismiss for lack of jurisdiction is granted, but in lieu of dismissal, this case is to be transferred to the United States Court of Appeals for the Ninth Circuit pursuant to 28 U.S.C. § 1631. The clerk is directed to enter judgment accordingly.

Each party is to bear its own costs.